IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 5, 2005 Session

## IN RE: S.D., M.D., Sh.D. AND Ma.S.

**Appeal from the Juvenile Court for Sumner County**
**Nos. 62-346, 62-347, 62-348 & 62-349     Barry Brown, Judge**

---

**No. M2003-02672-COA-R3-PT - Filed April 8, 2005**

---

This case comes before the Court on appeal from the Sumner County Juvenile Court's termination of Appellant's parental rights as to four children. Each parent raises separate issues on appeal. We affirm the action of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed.**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Charles R. Bobbitt, Jr., Randy Lucas, Gallatin, Tennessee, attorney for the appellant, M.A.S.

Russell E. Edwards, Hendersonville, Tennessee, attorney for the appellant, S.D.D.

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, attorneys for the appellee, State of Tennessee, Department of Children's Services.

W. Brian Stephens, Gallatin, Tennessee, guardian ad litem for S.D., M.D., Sh.D., and Ma.S.

### OPINION

This appeal results from the Department of Children Services' petition to terminate parental rights filed on October 8, 2002. At the time of the Petition, the four children had been in DCS custody for over two years, having been referred to DCS custody in March of 2000. At the time of that referral, the father, M.A.S., was serving a 20-year sentence for drug trafficking in the Commonwealth of Kentucky. The mother, S.D.S., had left the children with a baby sitter and failed to retrieve the children before the baby sitter left the children unattended. The four children were left unattended for 21 hours at the mother's residence on Gallatin Housing Authority Property.

The first of three permanency plans was staffed on July 10, 2000. This plan, the goal of which was to return the children to the mother, listed five barriers to reunification:

[1] The mother left the children with a baby-sitter who left the children unsupervised. The mother did not provide the baby-sitter with a number to contact her in case of an emergency. The mother did not inform the baby-sitter of her destination.

[2] [S.D.S.] cannot meet the child's safety/physical needs as evidenced by the home having safety and health hazards when the children were removed from the home.

...

[3] [S.D.S.] tested positive for marijuana usage. [S.D.S.] is suspected of using Crack Cocaine.

[4] [S.D.S.] and [M.A.S.] will provide monetary support for their children.

[5] [M.A.S.] is currently incarcerated for drug possession. This places his children at risk.

The Permanency Plan required several steps to be taken to overcome these barriers. Mother was to keep the home clear of clutter, abstain from further criminal activity, attend parenting classes, complete alcohol and drug assessment and follow the recommendations of that assessment, submit to random drug screens, and pay child support.

At the time of the Permanency Plan staffing, Wayman Dismukes was the mother's case manager with the Department. Mr. Dismukes bore the responsibility, at least initially, of marshaling the Department's resources and helping the mother take the steps necessary to overcome the barriers to reunification. Dismukes eventually submitted the Petition to terminate Parental Rights, but, by the time the Petition was heard, he had left the Department's employ. As a result, the State relied upon the testimony of his supervisor, Juanita Jackson and his successor Carrie Brock.

Shortly after the first plan was staffed in July of 2000, a second Permanency Plan was staffed in September of the that same year. This plan echoed the requirements of the previous plan, including the requirement of keeping the homeplace free of clutter. Shortly after the staffing of this Plan, the Gallatin Hosing Authority notified the mother of their intent not to renew her lease, citing as grounds, not only the events that led to the referral of the children to DCS, but also the mother's failure to keep the apartment in good repair and clear of clutter, such as alcoholic beverage containers that were left on the property. The condition of the apartment required extensive clean up and maintenance on the part of the Authority. This clean-up resulted in certain charges that remained unpaid up to and including the date of the hearing on the State's petition.

As a result of her actions in March of 2000, in November of that year, Mother pleaded guilty to the offense of contributing to the dependence of the four minor children and received a sentence of 23 months probation. The record reveals that the probationary requirements were that the mother pay probation costs and court costs and submit to drug screens with her probation officer. As for

dependency proceedings in juvenile court, the record reveals that the mother initially complied with the Permanency Plans and submitted to inpatient drug treatment.

Juanita Jackson testified that despite this initial compliance, Mother was increasingly uncooperative with the Department's efforts to remove the barriers and reunify the family unit. Ms. Jackson testified that throughout the year of 2001, and despite admonition from the Department, Mother failed to maintain a permanent residence where she was a designated lessee or owner of a home suitable for the four children. In fact, due to difficulties in communicating with the mother, the Department could never substantiate where she worked or lived at any particular moment in time. Despite requirements that the mother keep the Department informed as to her employer and to work with the Department in making a suitable home, the contact numbers and residences supplied to the Department were obsolete at the point of receipt. Nonetheless, testimony at trial reveals that the mother alternated between living with a close friend and that friend's mother. These two alternate residences were located in Metro Nashville and Davidson County. The close friend's residence was an apartment in Bellevue. The other residence was a house located on Ninth Avenue North in downtown Nashville. In September of 2001, the Department conducted a home study of the Bellevue apartment. In the process, Mother informed the Department that her name was not on the lease. In addition, an inquiry to the apartment manager indicated that such living arrangements constituted a violation of the friend's rental agreement that could result in the eviction of the tenant. This home study made the following recommendations:

> [Mother]'s immediate problem is that she has not established a permanent home for her children. In addition, [Mother] is not employed full time in order to care for her children. The children have a multitude of issues that requires an array of therapy and mental health counseling. [Mother] should continue to seek full time employment and a permanent home for her children. She should continue to seek mental health therapy to improve her coping skills. It is further recommended that [Mother] participate in additional parenting classes aimed at assisting her to improve her interactive abilities, including positive limit setting and structured activities, with her children.

> It is recommend [sic] that the children remain in the custody of the Department of Children Services. It is uncertain when reunification will occur. This department will continue to monitor and assist this family.

After this home study was completed, the Permanency Plan was revised on October 1, 2001. The Plan noted that at the time of staffing Mother was gainfully employed yet still lacked a stable home and the ability to meet the safety and physical needs of the children. Although the prior two Permanency Plans were signed by Mother, this latest Plan was not. The plan required her to maintain stable housing free of all health issues, continue the employment and provide the Department with documentation of income. In addition, Mother was to provide DCS with information for the background check on her roommate and was to work with Residential Services, Inc. (RSI), a contract agency of the Department, to formulate a safety plan. The latter of these steps

was to be completed by November 19, 2001. The goal of the plan was changed to reflect alternative goals of relative placement, adoption and reunification. The three barriers to permanency – – lack of a stable home, unstable employment, and intermittent drug use – – remained constant in the Plans.

The mother's employment history reflects the instability noted in the Plans. From August to September of 2000, Mother was employed with UPS. From September of 2000 to January of 2001, Mother was employed with Burns Security, Inc. From March 15, 2001 to February 2002, by her own testimony, Mother worked for "Crown Corporate," a house-keeping company. She was laid off from that job for lack of work. Subsequent to that layoff, Mother obtained employment with Barton House, an Alzheimer treatment facility, where she worked for two months. From that employment, she began work in May 2002 for the Ramada Inn until June 2002, when her probation was revoked due to a positive drug screen and failure to pay court costs.

As for Mother's drug usage, the record does disclose a significant lengthy period wherein Mother tested negative for any controlled substances. It bears noting that this period coincided with Mother's inpatient treatment at the Meharry Clinic. In October 2001, at the time the third Permanency Plan was staffed, a drug screen administered by Juanita Jackson registered positive for marijuana usage. Thereafter, Mother refused to take subsequent random screens on March 21 and March 22 of the following year. In May 2002, Mother tested positive on another random drug screen. This test was administered by her probation officer. She continued to test positive the following two months. On June 17, 2002, a warrant was issued for Mother's violation of her probation. Despite Mother's testimony to the contrary, the record reveals that after serving a portion of her revocation sentence, in September Mother was released on bond until October 21, 2002. No visits occurred in that time period. From December of 2001 through August of 2002, Mother attended only nine of her 18 scheduled visits with the children. From her release on November 23, 2002, through October 2, 2003, Mother had visited her children a grand total of four times. Despite having five different jobs between August 2000 and June 2002, Mother made no payments in support of her children. After relapsing on drugs in June of 2002, Mother refused to attend another alcohol and drug treatment program.

The most troubling aspect of this case is the nature of Mother's interaction with the Department in the early months during which the children were in State custody. Had the record in this case contained the testimony of Mother and case manager Dismukes alone, this Court, and indeed the trial court, would have serious difficulty in determining whether clear and convincing evidence supported the State's claim that Mother failed to substantially comply with the Parenting Plans. In her testimony, Mother claims to have had stable housing throughout the custodial period. But, upon further examination, she admits that she has lived at three different residences, without any legal interest in those residences. She claims that her criminal record prevented her from obtaining public housing and that the very efforts that the State took to remove the children interfered with her ability to keep stable housing. The State countered this testimony with that of Sue Dean, an employee with the Gallatin Housing Authority who testified to the exact reasons why

Mother was removed from public housing. Her testimony was corroborated with a letter from the Housing Authority submitted as an exhibit:

Gallatin Housing Authority has elected not to renew your lease because of failure to dispose of garbage properly, engaging in or permitting unlawful activities in the unit, to keep the dwelling unit and any other areas assigned for the Resident's exclusive use in a clean and safe condition, and allowing persons to loiter in front of your apartment openly drinking alcohol as witnessed by employee of this office. Specifically, this Agency has had to pick up trash, paper, beer bottles, etc. from your yard area on 4 separate occasions this past year. Also, the police were called to your home on March 20, 2000 to investigate a child neglect claim and discovered the total disarray and filthy condition your children were living in. On June 15, 2000 an annual inspection was conducted and your apartment was found to be in desperate need of repair due to tenant neglect and abuse. In addition to the foregoing, you have not complied with the community service requirement under paragraph 16o., a serious violation of your lease in itself. Under paragraph 16. of your lease, repeated and/or serious violations during the course of a lease's one year term constitutes sufficient grounds to deny lease renewal.

Mr. Dismukes, for his part, gave his own contradictory testimony regarding compliance with the Permanency Plans.

Q    Initially when the children were removed from [Mother's] care was there a plan initiated?

A    Yes, it was.

Q    Okay. And what did the plan call for?

A    Told her to meet certain requirements, drug and alcohol treatment, certain items in the plan – – drug and alcohol treatment, parenting class. And she met all of the requirements, certificate – – she completed all of these requirements.

Q    Initially when the children were taken did you ever indicate to her – – or any of her friends, particularly – – did you ever indicate that there was a time limit in which the case should be concluded?

A    Yeah. We had a time limit on her completing all of those requirements, like parenting class, drug and alcohol assessment, counseling. She met all of those requirements.

Q    And did you at any point tell Ms. Downey that she had completed everything and the children were going to be brought back home to her? Do you remember telling her that?

A    She completed all of those, and I don't – – I can't recall that. Maybe I did. Maybe I didn't. I can't recall that. I know she completed all of those requirements, and I don't – – that's all I can say.

Q    There's been an issue about random drug screens to be taken in this case. Do you remember whether or not [Mother] was ever court-ordered to have random drug screens? Did you ever discuss that with her?

A    You know, I didn't see that in the permanency plan. DCS came out with an order about not letting parents – – they could refuse the drug test. I think it came out in the – – I think it came down from the Commissioner's Office that the parent didn't have to take the drug – I think she took a drug test.

Q    Would you have told her that? In other words, would you have said to her that she did not have to take a random drug screen, if she testifies that's what she was told?

A    Yeah, I can testify to that.

Q    Might you have told her that, that she did not have to take a random drug screen if DCS wanted her to take one?

A    Yes, uh-huh.

Q    And what was the reason – – well, let me ask you this: Based on your review of the records what was the reason that the children – – and I'm talking about the first permanency plan – – if [Mother] had completed everything – and you're saying that she had completed everything she as supposed to do – – why weren't the children returned to her?

A    I think it was her economic situation, unemployment. She completed everything on the permanency plan, as we stated, and it was her ability to find suitable home and employment.

Q    Did you ever go to the homeplace where she lived – --

            MR. WILLIAMS:    Can I have a moment, Your Honor?

            THE COURT:    You may

BY MR. WILLIAMS:

Q    – – with Ms. Thomas, did you ever – --

-6-

A    Yes, I did.  It was in Bellevue.

Q    And did you – – at that point in time was [Mother] living there?

A    Yes, un-huh.

Q    And was there any reason that – – was it an apartment or a house?

A    It was an apartment.

Q    Did [Mother] indicate to you that she had permission to live there?

A    Yes.

Q    And did you find the home to be suitable?

A    Yes, I did.

Q    Did you ever tell [Mother] that she had to have her own home?

A    Yes, un-huh.

Q    What I'm saying is that it wasn't permissible for her to live with somebody else, that she had to live alone?

A    I think I did a court report on this – – me and another case manager went out to the home and I did a court report for [Mother].  And [Mother] wasn't on the lease.  The apartment management at the complex wouldn't allow [Mother] to be on the lease to allow kids to come to the complex.

Q    Did you talk to the lady that was involved, the apartment manager?

A    Yes.  Her name was in the court report.

. . . .

Q    And at some point when the first permanency plan was in effect did you have any conversation or did you tell DCS that you didn't see any reason why the children couldn't come home to [Mother]?

A    Did I tell [Mother] that?

Q   No.  Did you tell anyone at the Department of Children's Services that you felt like the children should be able to come home to her because she had complied?

A   I think I did.  She complied.  Like I said, the only situation we had with [Mother] was that her – – at the time she was – – you know, had a lot of situations going on in her life.  And she complied with everything on the permanency plan.  It was her economic situation.  That was the only thing that kept the children from coming home, a permanent place.

Upon cross examination by the State, Mr. Dismukes attempted to clarify his prior testimony.

Q   Mr. Dismukes, I'm actually trying to get clear in my mind what it is that you're testifying to.  Now, you are the petitioner in this petition to terminate parental rights.  Is that correct?

A   Yes, ma'am.

Q   Do you need me to show you this petition?

A   No, ma'am.

Q   So when we filed this on October 8th of 2002 you signed this sworn petition that it was in you – – you're requesting the Court to terminate her parental rights.  Do you still stand by that peition?

A   Yes, ma'am, I signed the petition.

Q   And are the facts in that true – --

A   Yes, ma'am.

Q   – – that you swore to, that she was in substantial non-compliance with the permanency plan at that point in time?

A   Only thing different was her economic situation.

Q   Okay.  That she willfully abandoned the children for more than four consecutive months?  Had she ever gone that long without having any contact with you?

A   At that time I didn't know where she was.  She was incarcerated at that time and I didn't find out until I came to court that day and somebody said she was

downstairs. That's the only time she – – I didn't have no lack of knowledge where she was. [sic]

Q    You also allege that for more than six months the conditions which led to removal of the children or other conditions which would cause them to be subjected to further abuse or neglect still persisted. Is that correct?

A    Yes, ma'am.

Q    And you also asked the Court to terminate [Father's] rights?

A    Yes, ma'am, I did.

Q    He was incarcerated, correct?

A    Uh-huh.

Q    Now, I'm going to show you – --

MS. CARLTON: And I believe, Your Honor, this is already part of the record. If not, I'd like to make it an exhibit.

BY MS. CARLTON:

Q    Is this the home study that you were referring to?

A    Yes, ma'am.

Q    And what's the date on it?

A    September 2001. This was September 17th, 2001.

Q    Okay. And let's just flip to the back, and if you could just take a minute and review those recommendations and summarize those for the Court. I'll give you a minute to read what you recommended.

A    It's a good report. Okay. This was done 2001. This was done – yes, okay.

Q    Okay. And what were your recommendations to the Court at that point in time?

A     To have the children remain in State custody and [Mother] to seek additional counseling.

Q     And she also needed to continue to seek full-time employment and a permanent home for the children, right?

A     Yes, ma'am.

Q     Okay.  It says it is further recommended that [Mother] participate in additional parenting classes?

A     Yes, ma'am.

Q     Okay.  So at that point in time it was your position – – and you stand by that today – – that the children needed to remain in State's custody?

A     Yes, ma'am.

The State further elicited testimony from Mr. Dismukes' supervisor who took over Mother's case, confirming that Mother failed to maintain contact with the Department, failed to obtain stable housing, failed to obtain stable employment, and most importantly, failed to visit or support her children under circumstances that clearly and convincingly show willfulness as contemplated in the statutes.  *See* Tenn.Code Ann. § 36-1-102(1)(A)(i).

Throughout this period, Father was incarcerated in the Commonwealth of Kentucky.  On October 8, 2002, the Department filed Dismukes' verified petition to terminate both parents' rights to the children.  For reasons not readily apparent, the Petition was not heard until October of 2003.  That hearing was stretched over four months, occurring on three different days.  At the conclusion of this hearing, the trial court issued a 15-page Order Terminating the Parental Rights of the mother and father, finding in pertinent part:

**FINDINGS OF FACT:**

! It is uncontroverted that the Defendant Father is currently serving a twenty (20)-year sentence for drug trafficking and that he was convicted for that offense in 1999, when all four (4) of his children were under the age of eight (8) years old.
! The Sumner County Juvenile Court has jurisdiction to hear this matter pursuant to T.C.A. § 36-1-113(a).
! [S,D,] was born on December 8, 1992.
! [M.D.] was born on October 8, 1994.
! [Sh.D.] was born on March 19, 1996.
! [Ma.S.] was born on February 21, 1998.

-10-

! [S.D.S.] is the natural mother of all four of the above-named children.
! [M.A.S]. is the natural father of all four of the above-named children.
! [S.D.S.] and [M.A.S.] are still legally married.
! [S.D., [M.D.] and [Sh.D.] and [Ma.S.] were placed in the custody of the State of Tennessee, Department of Children's Services, Sumner County Office, by emergency removal on March 12, 2000.
! On April 26, 2000, the children were adjudicated dependent and neglected by this Court because the Court found that their mother left them with a babysitter without telling the babysitter how to reach her, the babysitter then left the children alone at approximately 3:00 p.m. on Saturday, March 11, 2000, and the mother did not return until approximately noon on Sunday, March 12, 2000. The children's father was incarcerated at the time. The mother failed to appear at the adjudicatory hearing.
! The Department of Children's Services developed permanency plans for the children that set out the barriers that needed to be overcome in order for the Defendant Mother to regain custody of her children. As early as September 5, 2000, the plan required the mother to "work with a homemaker in order to learn how to properly maintain her home," "not use illegal drugs" and "submit to random drug screens." Furthermore, this plan required the mother to pay 46% of her income in child support and to visit her children a minimum of four (4) hours per month. She was responsible for her own transportation and was to arrive at the scheduled visitations on time. The mother signed the plan, noting only that she didn't like the statement of using crack." The plan was ratified by the Court.
! The next permanency plan, dated October 1, 2001, required the mother to "provide stable housing" and "work with a homemaker in order to learn how to properly maintain her home so it will be safe for her children." It also required that the mother to [sic] "participate in therapy," "provide releases to DCS regarding counseling," and "follow recommendations of the counselor." Mother was to "maintain steady income that enables her to provide for the needs of her children." The plan again required that the mother refrain from using illegal drugs and submit to random drug screens, but a new requirement was added that the mother "must return to drug and alcohol treatment" because she tested positive for marijuana at the DCS office on the day the staffing was held. This plan was also ratified by the Court.
! The Defendant Mother testified that she had agreed to follow all recommendations of the drug and alcohol assessment, but admitted that she never returned to treatment after she relapsed. She further admitted that she had repeatedly refused drug screens when the Department requested her to submit to them.
! The Defendant Mother testified that she has moved back and forth during the past three years between her friend's residence and that of her friend's mother. She admitted that she does not have her own housing. The mother

testified that she applied for her own apartment but did not qualify for one because of a felony charge (not conviction) for child neglect. This was the charge which stemmed from the incident resulting in the children coming into state's custody, but it was pled down to a misdemeanor. The Court does not find the mother to be credible as to this claim, as a witness from Gallatin Public Housing testified that the mother could have reapplied for public housing if she would have paid a past due balance owed for cleaning charges left over from her last apartment. The witness further testified that the mother's misdemeanor conviction would not have barred her from obtaining public housing.

! The Defendant Mother further testified that she had to move repeatedly because she was living in fear that her husband would find her. However, [M.A.S.] has been and remains incarcerated.

! An employee of the Department of Children's Services testified that the Defendant Mother tested positive for THC on June 8, 2000, and again on October 1, 2001. The same witness testified that the Defendant Mother was asked to submit to a random drug screen on March 21, 2002, at a visit with the children and that she refused because it was in a public place (a pizza parlor). When asked if she would come to the DCS office to be screened, the mother stated it was "too far." However, it was shown that she, in fact, was in the DCS office the very next day on March 22, 2002, and again refused to be drug screened.

! The mother's probation officer testified that while [S.D.S.] was on probation to her, she tested positive for THC in May, June and July of 2002. The mother had been able to provide clean screens earlier in her probation, but she had been in treatment at Meharry during that time frame. After she relapsed, she did not resume drug treatment, which was required by the permanency plan, and continued refusing to submit to random drug screens. In fact, the mother refused to submit to a random drug screen as late as September 17, 2003.

! The mother did not pay 46% of her income as required by the permanency plan dated September 5, 2000, nor did she attend therapy or counseling as required by the October 1, 2001, permanency plan.

! The Defendant Mother testified that she left five (5) different jobs between August 2000 and June 2002, a period of less than two (2) years. She further stated that she had been fired from her second job because she kept having to go to court and visit with her children and that it "was the Department's fault." However, the mother's probation officer testified that the mother had told her she had been fired due to not having any transportation.

! Caseworkers from Residential Services, Inc. (RSI), a contract agency of the Department, were responsible for supervising the visitation between the Defendant Mother and the children. From November 2000 to November 2001, there were twenty-four (24) visits scheduled and the mother attended

eighteen (18) of them. The RSI workers testified that the Defendant Mother was initially cooperative with them, but that this changed in the fall of 2001, when she bgan arriving for the visits later and later, sometimes not showing at all. The children would be disappointed and distressed when she did not come to the visits. The Court recalls that the Defendant Mother testified [sic] positive for marijuana on October 1, 2001. From December of 2001 to January of 2003, there were twenty-seven (27) visits scheduled. Of those visits, RSI had to cancel one of them due to an illness in the caseworker's family. The Defendant Mother only attended nine (9) of the twenty-six (26) visits.

! The Defendant Mother testified that she was in jail from approximately the middle of June 2002 until November 23, 2002. This testimony was impeached by her probation officer, who stated that [S.D.S.] was definitely not in custody on the day of her revocation hearing on October 21, 2002.

! The Defendant Mother telephoned Ms. Catherine Stern at RSI requesting a visit in December, which was arranged and occurred on December 20, 2002. The Defendant Mother did not contact RSI again until July 29, 2003, when she called and requested another visit. She resumed supervised visits on August 8, 2003, despite refusing drug screens on August 25 and September 17, 2003.

! All four of the subject children have special needs. For example, [M.D.] and [Ma.S.] both have ADHD. [S.D.] is in therapy and has behavioral issues. Each of the caseworkers who testified stated that the children need a significant amount of attention and that they will require someone who is very devoted to meet their needs. Each of the caseworkers who have been involved with these children for several years expressed the opinion that it is in the best interest of all of the children for them to be freed for adoption.

! The Department of Children's Services has made reasonable efforts to assist the Defendant Mother in establishing a suitable home and in attempting to reestablish the family unit.

! The Department formulated permanency plans for each of the children as required by law, and the Court finds that the statements of responsibilities contained in those plans were reasonable and reasonably related to the reasons the children were removed from their mother.

! The Court finds that the Defendant Mother was represented by counsel and understood her duties and obligations as contained in the plans.

**CONCLUSIONS OF LAW:**

The Court finds by clear and convincing evidence that there are grounds to terminate the parental rights of the father based solely on the grounds set out in T.C.A. § 36-1-113(g)(6), and that the Court need not and declines to examine the other grounds alleged against the Defendant Father. Defendant [Father] was

sentenced to ten (10) or more years in a correctional facility by order of a court of competent jurisdiction for a criminal act and all four (4) of his children were under the age of eight (8) years old at the time of his sentencing.

The Department of Children's Services brings this petition against the Defendant Mother alleging three grounds under T.C.A. § 36-1-113: abandonment, substantial noncompliance and persistence of conditions.

The Court finds by clear and convincing evidence that grounds exist for termination of the Defendant Mother's parental rights to the children pursuant to T.C.A. § 36-1-113(g)(1) in that she has abandoned the children by failing to pay any portion of child support. She further abandoned the children by exercising only token visitation during the four-month period immediately prior to the filing of the Department's petition and/or the four-month period prior to her incarceration in or around June of 2002. It is unclear from the evidence exactly when the Defendant Mother was incarcerated, but she attended only one-third of the scheduled visits during that entire year.

The Court further finds by clear and convincing evidence that grounds exist for termination of the Defendant Mother's parental rights to the children pursuant to T.C.A. § 36-1-113(g)(2) in that there has been substantial non-compliance by the mother with the permanency plans devised for the children. She has failed to follow the permanency plan statements of responsibilities, which were reasonable and directly related to remedying the conditions that necessitated the children's placement in foster care.

The Court further finds by clear and convincing evidence that grounds exist for termination of the Defendant Mother's parental rights to the children pursuant to T.C.A. § 36-1-113(g)(3), in that the subject children have been removed from the Defendant Mother for more than six (6) months and the conditions which led to removal or other conditions which in all probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's return to the care of the Defendant still persists; that there is little likelihood that these conditions will be remedied at an early date so that the children can be returned to their mother in the near future, and that the continuation of the legal parent and child relationship greatly diminishes the children's chance of early integration into a stable and permanent home.

Now having determined that grounds for termination of [M.A.S.]'s and [S.D.S.]'s parental rights exist, the Court moves to its decision relative to the children's best interest.

T.C.A. § 36-1-113(i) specifies some of the factors for a best interest consideration. The nine factors *are not all inclusive.* The Court may consider other factors. The nine suggested factors are:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the Department pursuant to § 36-5-101.

Applying these standards, the Department has established by a clear and convincing standard that the best interest of these children requires all parental rights of [M.A.S.] be forever terminated. The Defendant Father has been unable to make such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be in his home. He is incarcerated and has no home. The Department has made reasonable efforts to explore the father's relatives as placement possibilities to no avail. None of his relatives have stepped forward as being willing and/or able to care for his children. The Defendant Father has not maintained contact with the children, even before they were taken into state's custody. Despite testimony about the father's correspondence with the DCS Case Manager, Mr. Dismukes, he never spoke of forwarding any letters or gifts to the children themselves through Mr. Dismukes. Due to the children's tender ages at the time of their father's incarceration, it must be concluded that no meaningful relationship exists between them. According to the State of Kentucky, Department of Corrections, the Defendant Father will not be eligible for parole until March of 2009. He clearly was engaged in dangerous criminal activity prior to his incarceration, as his conviction is for drug trafficking. These children have already been in foster care for nearly four (4) years and it is clearly in the best interest of the children that they not continue to languish in foster care. Finally, the Defendant Father has failed to pay any portion of even token child support to the State of Tennessee for the benefit of his minor children. Continuation of the paternal parental relationship would serve no purpose and in no way represents the best interest of these children.

With regard to the Defendant Mother, the Court specifically notes that if the State had carried its burden as to only one or, perhaps even two, of the alleged grounds, it would have made the best interest argument more difficult for this trier of fact. The children are not in the same foster home at the present time, and they each have special needs. Clearly, it may prove difficult to locate an adoptive family who will be willing to step up and embrace all four (4) children as their mother now states she is ready to do. However, such is not the case. The Court does find that the State has carried it s burden as to all three of the alleged grounds, and the cumulative effect of that finding is that it appears unlikely the mother would ever be able to turn her life around to the extent that she would be able to appropriately parent her children. In that the Defendant Mother is still in substantial non-compliance with the permanency plans and refusing drug screens after this length of time, the Court is not convinced that permitting her even more time would make any difference. To the contrary, these children have already been in separate foster homes for far too long. They deserve an opportunity to be reunited and to have a chance at a normal family life together.

[Mother] has failed to make such an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest for them to be returned

to her. She went for long periods of time without maintaining regular visitation or other contact with the children. She admitted to going eight (8) months without seeing the children even after the Petition to Terminate was filed. There is doubt in the Court's mind as to whether the physical environment of the mother's home is healthy and safe, particularly due to her continued failure to submit to random drug screens when the Department requested them. She refused to return to her drug treatment program after relapsing. Although the children apparently still have a bond with their mother, the Court is concerned about the devastating effect it would have on the children's emotional and psychological condition if they were to be returned to her only to end up in foster care again. She was neglectful toward them when they were in her care and custody before, that being the reason the children came into state's custody in the first place. The Court is not convinced that she has effected a lasting adjustment of her circumstances despite the reasonable efforts of the Department and, particularly, RSI. All of this despite the children being out of her custody for years. With only herself to care for, the Court finds that the Defendant Mother should have been able to make more progress toward reunification. Not only has she failed to do so, she has also failed to pay child support consistent with the child support guidelines despite that requirement being set out on the early plans of care. The best interest of these children is served by their being freed for adoption.

In that the State of Tennessee, Department of Children's Services, has proven grounds by clear and convincing evidence, this Court so finds that it is in the best interest of the children and the public that this proceeding be brought for all of the foregoing reasons, and that all of the parental rights of Defendants to these children be forever terminated, and that the complete custody, control and guardianship of said children be awarded to the State of Tennessee, Department of Children's Services, with the right to place the children for adoption and to consent to such adoption *in loco parentis*.

This Decree shall have the effect of terminating all of the rights and obligations of the Defendant to the said children and of the said children to the Defendants arising from the parental relationship, and the Defendants are not hereinafter entitled to notice of proceeding for the adoption of the said children by another, nor have they any right to object to such adoption or otherwise to participate in such proceedings.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:**

That all of the Defendants [M.A.S.]'s and [S.D.S.]'s parental rights to the children, [S.D.], [M.D.], and [Sh.D.] and [Ma.S.], be and the same are hereby forever terminated and the complete custody, control and guardianship of the said children is hereby awarded to the State of Tennessee, Department of Children's Services as the full guardian of said children, with the right to place them for adoption and to consent to their said adoption *in loco parentis*.

-17-

**IT IS SO ORDERED.**

From this Order, Father appeals, challenging the procedure of the hearing, insofar as the trial court allowed participation via telephone on Father's part with Father's counsel being in the courtroom proper. Father argues that under the circumstances, Father was not given effective assistance of counsel in the termination proceeding. Mother challenges the conclusions of the court as unsupported by clear and convincing proof.

The Department asserts and Father admits that at the time of the filing of the Petition and at the time of the hearing he was serving a sentence in excess of 10 years in the Department of Corrections resulting from a felony conviction which had occurred prior to the oldest child's eighth birthday. Father urges on appeal that the procedure implemented by the trial court prevented Father's counsel from effectively assisting him in defending against the Petition. His primary complaint is that while he participated in the hearing by teleconferencing from his place of confinement in the Department of Corrections, he was not able to consult privately with his counsel, and such failure prevented his counsel from being able to effectively assist him. Assuming that due process requires the appointment of counsel, *State ex rel. T.H. by H.H. v. MIN*, 802 S.W.2d 625 (Tenn.Ct.App.1990), and that such appointment would entitle him to effective assistance of counsel in this termination proceeding, it is difficult to imagine how his counsel could have been any more "effective" than he was when one considers the only ground upon which the termination of the father's parental rights was ordered. Tennessee Code Annotated § 36-1-113(g)(6) provides as a ground for termination for parental rights:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

On appellate review of termination decisions, this Court has held:

> In reviewing termination decisions, this court has recognized that the existence of any one of the statutory bases will support a termination of parental rights. *See In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *5 (Tenn.Ct.App. May 26, 1999) (*no perm. app. filed*); *Department of Children's Servs. v. Darr*, No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn.Ct.App. Mar.24, 1998) (*no perm. app. filed*); *Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn.Ct.App. Oct.31, 1997), *perm. app. denied* (Tenn.Mar.2, 1998). In the present case, therefore, we must affirm the trial court's judgment terminating the Mother's parental rights if the record contains clear and convincing evidence to support any of the bases found by the trial court. *See M.C.G.*, 1999 WL 332729, at *5; *Darr*, 1998 WL 128874, at *3; *Manier*, 1997 Wl 675209, at *5; *see also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn.Ct.App. Mar.27, 1998) (*no perm.app. filed*).

*In re C.W.W.*, 37 S.W.3d 467, 473-74 (Tenn.Ct.App.2000).

The record in this case establishes, without dispute, this ground for terminating Father's parental rights, and no amount of legal representation, "effective" or "ineffective," can overcome conclusive proof. We are not required to determine whether due process requires not just appointment of counsel in termination cases, but effective performance of counsel. *See State ex rel. T.H. v. MIN*, 802 S.W.2d 625 (Tenn.Ct.App.1990); *In re Adoption of J.D.W.*, 2000 WL 1156628 (Tenn.Ct.App.2000). *See also* Calkins, Susan, *Ineffective Assistance of Counsel in Parental-Rights Termination Cases: The Challenge for Appellate Courts*, 6, J.App.Prac. & Process 179 (2004).

Mother's sole issue on appeal is whether clear and convincing evidence supports the ground upon which the juvenile court terminated her parental rights to the children. In its Order, the trial court specifically found that Mother abandoned her children by failing to pay any portion of child support, and by exercising only token visitation during the four-month period immediately prior to her incarceration. In addition, the trial court specifically found that Mother had failed to follow the permanency plan responsibilities which were reasonable and directly related to remedying the conditions that necessitated the children's placement. The trial court also specifically found under Tennessee Code Annotated section 36-1-113(g)(3) that for more than six months, persistent conditions exist which would subject the children to the danger of abuse and neglect and, therefore, would prevent reunification.

The existence of any one of the statutory bases for termination of parental rights will support that termination. *See In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn.Ct.App. 2000). Despite the troubling nature of the communication between Mother and Case Manager Dismukes in the months immediately following the removal of the children from Mother's custody, the record is replete with evidence of the mother's inability to provide monetary support for these children, despite having been ordered to do so. Mother's sketchy employment history and the complete absence of a home suitable for these four children are equally supported by clear and convincing evidence in the record.

Mother argues that her incarceration for probation violation prevented her from visiting with the children for the four months preceding the filing of the State's Petition. Assuming Mother's incarceration commenced July 8 pursuant to her testimony in the record, her first request for visitation with her children did not occur until the following October. In addition, according to her probation officer's testimony, Mother was not incarcerated between July and October and otherwise free to visit with her children. The children, who are the subjects of this petition, are all in separate foster placement. They have been so situated outside of the custody of their mother for nearly five years. The testimonial record reveals several instances where the Department, through the foster care placement agency, arranged for all of the children to converge in the McDonald's in Inglewood, only to have the Mother never show up. In other visitation instances, Mother was late. And, when it became clear that the Department was seeking the termination of her parental rights, Mother exercised even less visitation than she did before the filing of the petition to terminate.

As for Mother's argument that the record does not support a determination of substantial noncompliance with the Permanency Plans, the trial court specifically found, and this Court agrees, that despite the eventual best efforts of the department to help her, Mother failed to substantially comply with the requirements of the Permanency Plans which were reasonable and reasonably related to remedying the conditions which led to removal. *See In Re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); Tenn. Code Ann. § 37-2-403(a)(2)(C). The record clearly establishes that, in addition to her failure to substantially comply with permanency plan requirements, Mother also failed to pay any child support.

Clear and convincing evidence has been described as evidence eliminating serious or substantial doubt as to the correctness of the conclusions to be drawn therefrom. *See Hodges v. S.C. Toof and Co.*, 833 S.W.2d 896, 901 n.3 (Tenn.1992). Clear and convincing evidence produces in the fact finder's mind a firm belief or conviction as to the truth of the allegations made. *See O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.Ct.App. 1995). The testimonial and documentary evidence as presented make Mother's failure to substantially comply with the permanency plans' requirements, her willful failure to provide support and otherwise visit, and her persistent drug use and disregard for the care of her children, "highly probable." *See Estate of O'Cuff v. O'Linger*, 56 S.W.3d 527, 537. The best interest analysis applied by the trial court makes clear the equally high probability of continued neglect of these children in the absence of termination of Mother's parental rights. The needs of these children for permanent, caring homes clearly and convincingly trumps the Mother's desire for their custody and control in the absence of continued drug treatment, stable housing, and stable employment. Her lack of visitation in the months preceding the petition as well as those months during the pendency of this litigation more than adequately support the ground of abandonment. The trial court's termination based on this ground is affirmed.

The obstacles facing a mother whose husband is incarcerated for 20 years, leaving her alone with the responsibility to parent four small children would be formidable under the best of circumstances. Telling such a parent to get a job and get a house while simultaneously taking care of the children is less than an adequate solution to the problem. The difficulty is that when this requirement of the parenting plan was ordered, Mother did not have custody or responsibility for any of the children except the court-ordered child support that she was to pay. In spite of the DCS efforts to assist her, she would not or could not get a steady job. She would not or could not stop her drug usage. She would or could not get a stable home in which to be reunified with the children. She would not pay any child support. She would not adequately visit with her children. Once these deficiencies in her adherence to the Parenting Plans were established by clear and convincing evidence, the best interest analysis is simplified. Clear and convincing evidence establishes that termination is in the best interest of the children.

The judgment of the trial court is in all respects affirmed, and the case is remanded for such further proceedings as may be necessary.

Costs are assessed to the Appellant.

_____
WILLIAM B. CAIN, JUDGE